<u>AFFIDAVIT</u>

I, Scott Murray, having been duly sworn, depose and state as follows:

<u>INTRODUCTION</u>

1.       I am a Certified Explosives Specialist (CES) and Special Agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed for over 17 years.  Prior to working for the ATF, I worked as a police officer for the Phoenix, Arizona Police Department for nearly five years.  In my capacity as a special agent, I am familiar with the federal laws relating to explosives, bombs, firearms and controlled substance violations, have been trained in the investigation of violations of said laws, and have participated in such investigations.

2.       This affidavit is based upon my training, experience, and investigation, as well as information that has been conveyed to me by other law enforcement officers.  The following is either known to me personally or has been related to me by persons having direct knowledge of the events described below, including other law enforcement officers involved in this investigation.  Since this complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation.

3.       Probable cause exists to believe that on or about July 7, 2019, the defendant Mark Mattiace, knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed explosives, which had been shipped or transported in or affecting interstate or foreign commerce, in violation of 18 U.S.C. § 842(i).

1

PROBABLE CAUSE

4.      On or about July 7, 2019, at approximately 2:30 A.M., Mark Mattiace was

operating a 2002 Honda Civic sedan, Vermont license plate number HGG899, driving

northbound on Interstate-91 in Hartford, Vermont.  Mattiace was stopped by Hartford, Vermont

Police Department officer Eric Clifford for traffic violations and contacted by the officer after

pulling over. The vehicle license plate was loosely attached and was registered to Mattiace's

Chevrolet Suburban vehicle.  Mattiace admitted his driving privilege was suspended, stated the

Honda sedan was his girlfriend's vehicle, and said they recently argued over getting it registered

properly.

5.      The officer called to have the vehicle towed from Interstate-91 because it could

not be legally operated by Mattiace and had incorrect license plates attached.  Mattiace was

released from the scene. The officer conducted a standard inventory search of the vehicle prior to

it being towed to ensure no valuable nor dangerous items were present.  Upon looking inside, the

officer observed two plastic bags with a white crystalline substance and a glass pipe with burnt

residue in it located in the front pocket of a tool bag.  The items were consistent with that of

controlled substances and drug paraphernalia. The officer believed the controlled substances to

be consistent with crystal methamphetamine or other illegal synthetic drugs termed "bath salts."

6.      The officer stopped the inventory and applied for a search warrant of the vehicle,

which he later obtained.   In searching the vehicle further the officer found approximately 1.5

grams of white crystalline powder consistent with methamphetamines or "bath salts," a

suspected drug pipe, and a digital scale with powder residue on it in the center console.

7.      The officer also observed a suspected hand grenade in the rear seating area along

2

with other explosive materials and contacted the state police bomb squad for immediate assistance.

8.       State Police Trooper Matthew Sweitzer of the state bomb squad responded and recovered explosive materials contained in the rear seating area.  Trooper Sweitzer recovered the potential hand grenade, detonation cord, sections of time-fuse, and a section of time-fuse attached to an explosives blasting cap (also called a detonator).  The lever of the potential hand grenade had the word "catch" hand written on it in marker.   Hand grenades may contain a variety of explosives inside, a variety of explosive detonators in the fuse assembly, and can be modified by individuals to function utilizing a variety of explosive materials or fusing systems. Trooper Sweitzer secured the explosive materials in an explosives magazine until such time as they could be safely examined.

9.       On July 8, 2019, I met with Trooper Sweitzer and Trooper Stephen DiGregorio of the bomb squad regarding the explosives recovered from Mattiace.  I observed several feet of time-fuse (safety fuse) which has a black powder explosive core and will burn at a relatively slow rate to allow a person to walk away from the timed firing system once initiated.  One of the pieces of time-fuse had a high explosives metal blasting cap attached at the end, which would explode upon having the black powder time-fuse ignite the interior of the detonator. The blasting cap was clearly marked "Dangerous Blasting Cap" and appeared to have factory made crimp marks fastening the blasting cap to the time-fuse.  I, along with Trooper Sweitzer noted that the explosive materials and blasting cap appeared in very good condition and appeared to have been manufactured in the past several years.  An X-ray of the blasting cap found the detonator had apparent explosive materials within. Blasting caps such as these contain high explosives, are

3

highly regulated under state and federal law, require a federal explosives license to acquire, store, sell or transfer, and are defined as part of the federal explosives materials list.  A photograph of the recovered blasting cap is below:



10.     I also observed an approximate 2.5 foot piece of apparent high explosive detonation cord, which typically utilizes the high explosive called pentaerythritol tetranitrate (PETN).   PETN explosives have a higher explosive capability than most other explosives, including high explosives such as dynamite or trinitrotoluene (TNT).  The piece of apparent detonation cord had black electrical tape on either end.  I removed the black electrical tape at one end in order to expose the white powder core to verify its consistency with PETN.   The black electrical tape wrapped around the ends of the detonation cord appeared recently placed. The tape also came unwrapped relatively easy consistent with being recently placed.

11.     I requested the use of a portable chemical identification unit to confirm the

presence of PETN explosives within the detonation cord and personnel from the military civil support team (CST) responded to our location to provide assistance. The portable chemical identification system can identify substances utilizing a portable infrared laser system to conduct the analysis. The CST met with Trooper Sweitzer and me and utilized the First Defender RMX chemical identification device to analyze a small sample of the white powder manually removed from the suspected detonation cord by Trooper Sweitzer and myself into a vial. The identification device positively identified the explosive powder as PETN. High explosives detonation cord is highly regulated under state and federal law, requires a federal explosives license to acquire, store, sell or transfer, and is defined as part of the federal explosives materials list. A photograph of the high explosives contained within the detonation cord is below:



12.     Trooper Sweitzer utilized the state police portable X-ray system in analyzing the potential hand grenade, finding a dark inner core with little discernable characteristics other than

in the top fuse assembly, which appeared to be already fired. In reviewing the X-rays, the
characteristics of the potential hand grenade body, the fuse assembly attached on top of the
grenade and the weight of the grenade, investigators determined that the suspected hand grenade
did not contain explosive powders or other explosive materials inside.  The fuse assembly
threaded on top was subsequently removed and it was visually confirmed that the potential
grenade contained no explosive materials and contained a previously exploded low-level
detonator inside.

13.     On or about July 8, 2019, state police detective Mark Potter and I attempted to
interview Mark Mattiace at his residence located at 657 Village Road in East Corinth, Vermont.
I observed a large gray bus and a Chevrolet Suburban parked at the residence, consistent with
previously described statements made by Mattiace about his vehicle.  Mattiace's girlfriend, K.S.
answered the door and I identified myself as being a federal agent with the ATF. When asked her
name K.S. refused to provide it until I stated her name and she replied, "yes."  K.S. stated she
was leaving soon with a female friend for work, claimed Mattiace was not at the residence, and
stated she could not contact him at that time.  K.S. asked what charges were being brought
against Mattiace and what the intent was to speak to him.  Believing K.S. was potentially not
being truthful, I advised K.S. if she was lying about Mattiace being inside the residence she
could be charged with providing false information, however she maintained he was not present.
I provided contact information and requested Mattiace to call me.  Detective Potter and I left the
residence to meet with bomb squad members parked nearby who were there to assist if needed.

14.     Upon returning to the area of the residence approximately thirty minutes later to
watch for signs of Mattiace being at the residence, I observed that a large gray bus previously

6

parked at Mattiace's residence had departed.  Soon after, the gray bus returned with a white male driver with dark hair and a beard, subsequently identified as Mattiace.  I pulled into the driveway to make contact with the subject and approached him; he then asked, "Are you Scott?"  The subject identified himself as Mark Mattiace and agreed to speak with me.  I advised him he was not under arrest at that time and was not required to speak with me.

15.     Mattiace stated he knew I was there to speak with him about the "explosives" in the vehicle, which he stated were his.  Mattiace apologized that K.S. had provided false information about him not being there, stating she was scared upon being contacted while he was upstairs.  Mattiace stated K.S. was concerned that he would be arrested.  Mattiace stated he received the explosive materials from a relative.  Mattiace stated the subject has had numerous explosives over the years.  When asked the name of the relative, Mattiace changed his statement and stated he did not actually receive the explosive materials directly from the relative who he named.  Mattiace stated he inherited a large secretary's desk with drawers about ten years prior that had been provided by the relative, which he kept in an open garage on his property. Mattiace stated about eight years prior he had discovered "explosives" in the drawer to include a "grenade," "det cord," the attached blasting cap and an "initiator."  I noted the explosive materials and black electrical tape did not appear consistent with being stored for ten years in the condition that Mattiace described.  Mattiace described the "initiator" as a dark military green colored tube about five or six inches long with a "keyring" type ring at the bottom consistent with an M81-type initiator typically utilized in conjunction with the time-fuse recovered from Mattiace.  I noted this item was not listed as recovered by police.  Mattiace stated he believed that all of the dark green cord material he had was explosive detonation cord, stating he was not

7

aware some of it was time-fuse.  Mattiace stated he did not know for sure if the grenade had explosives contained within it or not.  Mattiace stated he was fearful of removing the safety pin from the grenade.  Mattiace stated the relative had previously served in the U.S. Navy and was discharged in the 1990's.  Mattiace stated the relative was often making homemade cannons and "blowing things up."  Mattiace claimed he himself did not know much about the explosives or how to operate them.  Mattiace stated he and the family member had a falling out several years prior.  Mattiace stated he had written the words "catch" on the spoon of the "grenade" as a joke. Mattiace stated his mother could confirm his accounts about the non-functioning grenade coming from a family member but not the explosive materials.  Mattiace stated his mother had previously told him that the grenade did not have any explosives contained within it.

16.    Mattiace stated he did not want the explosive materials to "blow up" and stated he had planned to remove them but had not yet done so.  Mattiace stated he was aware that he was not allowed to legally possess the explosives himself and he does not have a license to store explosives.   Mattiace stated he should have turned the explosives into police or had his girlfriend call the police because she was not a previously convicted felon.  Mattiace stated that his girlfriend K.S. recently was insistent that he remove the explosive materials from the property because "she was afraid they were going to blow up" in part because of the high temperatures outside currently.

17.    Mattiace stated that, on or about July 6, 2019, he removed the explosive materials from the drawer and put them all into a black nylon type drawstring bag, which is a bag that contained his motorcycle helmet when he received it.  Mattiace stated he had planned on taking the items to his friend "Russell's" house, where Mattiace claimed he planned on burying them in

the yard.  Mattiace stated he wanted to bury the items but still have them available in the future

in case a major violent conflict or catastrophic disaster occurred in the U.S. and he or someone

else needed them.  I asked Mattiace if he was a "prepper" (person who prepares numerous

supplies for military conflict or disasters) and stated he was not.  Mattiace stated "Russell" lives

in Sunapee, New Hampshire.  I told Mattiace that the area he was describing was south of his

residence, but that was not consistent with him being stopped traveling north on Interstate-91

with the explosive materials still in the vehicle.  Mattiace changed his statement and stated he

had gone to his friend's house to bury the explosives, but changed his mind because there was

not enough land that the house was situated upon.  Mattiace advised he was traveling back to his

residence from his friend's house with the explosive materials in the car and would have

potentially "stashed" the explosives in the woods nearby until he had a chance to bury them in an

open field area near his house the following day.  Mattiace stated upon being stopped by police

he had methamphetamines and a methamphetamine pipe on the seat next to him, which he

removed from the seat and hid in the rear seating area. Mattiace stated he typically smokes the

methamphetamines in a pipe.

      18.     I spoke to Mattiace about the fact that investigators historically have encountered

individuals using methamphetamines that have a high sense of paranoia, where they at times

utilize explosives to make "booby traps" or bombs.  Mattiace denied that he had any intentions

of creating any such harmful device nor did he have intentions of harming anyone with the

explosives he had.  Mattiace later stated that he does not feel a strong sense of paranoia or

addiction even though he admitted he used methamphetamines daily.  Mattiace admitted his

girlfriend did remove a shotgun and another firearm from his residence that same morning.

Mattiace advised she is an avid collector of firearms, but he is aware as a felon he cannot have firearms. Mattiace advised he was not aware that firearms could not be in his residence that belonged to someone else. Mattiace advised he currently had no firearms in his residence.

19.     Mattiace stated he had between five and seven prior felony convictions in Alabama and New Hampshire. Mattiace stated he was charged with seven felony counts for drug offenses in New Hampshire and pleaded guilty to one or two counts where he received one-year incarceration before being released. Mattiace stated he had a felony conviction in Alabama for breaking into vehicles, where he received a fifteen-year maximum sentence for the offense. Mattiace stated he had to serve about four years and nine months for the offense and was released from incarceration early. Mattiace stated he had a felony conviction in Alabama for a drug offense where he had to serve about two years' incarceration for the offense before being released.

20.     I advised Mattiace that his statements about where he obtained the non-functioning hand grenade appeared reasonable and apparently could be confirmed by his mother. I advised Mattiace I was concerned that he was not providing accurate statements about how he acquired the explosive materials and detonation cord because of the pristine condition of the explosive materials indicating it was newer than he claimed, which he denied. I asked if he had stored the explosive materials inside his insulated house or recently cut the detonation cord and placed the black electrical tape over the ends, which he denied. The electrical tape is added at the ends of detonation cord in order to prevent the explosive powder from slowly coming out. If newly wrapped electrical tape was placed at the cut ends of the detonation cord, it implied that recovered section of detonation cord was cut from a larger quantity of unrecovered material.

Mattiace denied that he was fabricating how he came into possession of the materials and denied that he had added the electrical tape.   I advised Mattiace that I appreciated his honesty in admitting to actual possession of the explosives and methamphetamine, but I was concerned as to his truthfulness of how he acquired the explosives, where he actually stored it, and if he recently cut sections of it, taped it, and had additional quantities of explosive materials. Mattiace denied that he had any additional explosive materials or knew the whereabouts of other materials.  Mattiace denied that he had traded methamphetamines in order to acquire the explosive materials and denied that he had already or had planned on trading or selling the explosive materials to another individual.

21.     Mattiace voluntarily brought me to his vehicle and stated I could look to ensure that he had no other explosive materials.  Mattiace pulled a backpack out of his vehicle and opened it showing it to me where I observed he had a plastic wrapped roll of black colored 3m Temflex brand electrical tape similar to the electrical tape used to tape over the ends of the detonation cord.  Mattiace brought me to the open garage on his property next to his house and showed me the secretary's desk he stated the explosive materials were found in.  Mattiace brought me inside his garage below his living area and inside his house where he lives.  Inside his residence he had a large room with a bed and tables inside.  I observed a roll of opened and cut black colored electrical tape on a work bench table in the large room.  I observed three apparent "M-class" cardboard explosive devices, called "silver salutes" on this same workbench. These are cardboard tubes with plastic ends and low explosive powders contained inside.  I noted individuals involved in explosives will at times cut open such devices in order to extract the explosive flash powder from inside multiple such devices.   I asked Mattiace about these devices

11

noting the consistency with his potential fascination with explosives.  Mattiace advised he simply had them for fun as fireworks, but said they had nothing to do with the other explosive materials. I told Mattiace he was facing significant charges and it was imperative that he turn over all of the explosive materials he possessed and that he must be truthful as to who he obtained them from. Mattiace denied having further information or materials. Mattiace allowed me to view the photographs on his cellular telephone to confirm he had no photographs of explosive materials or devices.  Mattiace voluntarily turned over the three explosive devices to me as part of the investigation. Walking through the property with Mattiace, I did not observe any additional high explosives or associated explosive materials.  Following the walk-thru of his property, I met again with Mattiace, advised him I appreciated his honesty about his possession of explosives and his cooperation.  I advised Mattiace it was important to recover any additional explosive materials and requested Mattiace contact me if he had any additional explosive materials in his possession or information about the whereabouts of additional materials.  After following up with Mattiace, I requested to take a photograph of him, which he agreed to, shown below:



22.     On or about July 10, 2019, I spoke to M.W., the mother of Mattiace, who confirmed that she did previously have a non-functioning grenade that she had in the family from 50 or more years prior.  M.W. stated she did not know anything about the detonation cord, blasting cap or time-fuse.  M.W. stated she would not have had anything to do with explosive materials nor stored them in the secretary's desk or in her residence.  M.W. stated she did give Mattiace the secretary's desk about five or six years earlier, when they moved it into the open garage at Mattiace's residence.  M.W. stated she had paperwork of hers from her childhood and other personal effects in the desk but did not have explosive materials.  M.W. stated she did not recall the non-functioning grenade being in there but stated it was possible.  M.W. stated she did recall the same family member named by Mattiace living in the bedroom where the secretary's desk was located for a period of time.

23.     On July 15, 2019 I went to the Hartford, Vermont Police Department where they

13

still had custody of the green colored Honda Civic vehicle that Mattiace was found in. I met with Hartford Police and conducted a search of the vehicle based upon probable cause for additional evidence contained within. There were numerous personal clothing and other items throughout the vehicle. Inside the vehicle, behind the driver's seat on the floorboard area, I located a black colored bag consistent with what was described to me by Mattiace. Inside the bottom of the bag, I found a green-colored M81 type fuse initiator described by Mattiace during my interview with him. I located a mostly used roll of black electrical tape on the floorboard of the driver's seat. While retrieving the black electrical tape, I observed a single round of .223 caliber ammunition inside of the open center console. I took custody of the three items as evidence in the investigation.

24.     On July 17, 2019 I followed up with Mattiace via telephone regarding a prior message I had left for him about the M81 fuse igniter. I advised Mattiace that I had recovered the fuse igniter in his vehicle. I also asked Mattiace about the methamphetamines found inside his vehicle when he got pulled over by police and he stated he recalled it was "less than a gram" which he had moved to the back seating area. I told Mattiace that the explosive materials with which he was found appeared newer, did not have apparent oxidation on the metal blasting cap, and looked in too good of condition for being stored in his garage for ten years as he previously claimed. Mattiace changed his prior statements and said he had moved the materials from his "barn" and into his bedroom about four years prior.

25.     I have specialized training and experience on the manufacturing locations of high explosives such as PETN and the manufacturing of blasting caps, which also contain PETN and other initiating explosives inside. There are current and former factory locations in the United

14

States and other countries that manufacture such products, but not in Vermont.  In order for a company to manufacture explosive materials and sell those materials they are required under federal law to obtain a federal explosives license from ATF.  I have also conferred with ATF industry operations, which provides any required licenses for any such permits to manufacture explosives in the United States to confirm such companies are and were not in Vermont.  I determined based upon my training, experience, and consultations that the detonation cord containing the high explosive PETN and the blasting cap containing PETN (among other initiating explosives), recovered from Mattiace on or about July 7, 2019, were manufactured outside the State of Vermont and therefore traveled in or affected interstate commerce before Mattiace possessed them.

26.     Upon conducting a criminal history inquiry and obtaining court conviction records, I found that Mattiace has previously been convicted of six prior felony offenses. Mattiace has four prior felony convictions in the state of Alabama where his name and date of birth are listed on the conviction records.  Mattiace has two prior felony convictions in the state of New Hampshire where his name, current address and date of birth is listed on the court conviction records.

27.     Mattiace received a felony conviction on May 2, 2005, in Maddison County Circuit Court of Alabama for Breaking and Entering of a Vehicle in docket CC-03-2953. Mattiace as a repeat offender was sentenced to receive up to fifteen years of incarceration for the offense.

28.     Mattiace received a felony conviction on June 5, 1998, in Maddison County Circuit Court of Alabama for Receiving Stolen Property in the 2nd Degree in docket CC-98-542.

Mattiace was sentenced to receive up to two years of incarceration for the offense.

29.     Mattiace received a felony conviction on May 18, 1998, in Maddison County Circuit Court of Alabama for Breaking and Entering of a Vehicle in docket CC-97-2147. Mattiace was sentenced to receive up to four years of incarceration for the offense.

30.     Mattiace received a felony conviction on May 18, 1998, in Maddison County Circuit Court of Alabama for Illegal Possession of a Credit Card in docket CC-97-2146. Mattiace was sentenced to receive up to two years of incarceration for the offense to run concurrently with his other sentence

31.     Mattiace has two felony convictions on January 4, 2016, in Coos Superior Court of New Hampshire for two counts of Controlled Drug: Acts Prohibited in docket 214-2015-CR-00111.  Mattiace was sentenced to one year of incarceration.

<u>CONCLUSION</u>

32.     Based on the foregoing, I submit there is probable cause to believe that on or about July 7, 2019, the defendant Mark Mattiace, knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed explosives, to

wit, a blasting cap and detonation cord containing PETN, which had been shipped or transported in or affecting interstate or foreign commerce, in violation of 18 U.S.C. § 842(i).

Dated at Burlington, in the District of Vermont, this 2d day of August, 2019.

_____
Special Agent Scott Murray
Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn to and subscribed before me this 2d day of August, 2019.

_____
JOHN M. CONROY
United States Magistrate Judge

17